# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>KEVIN FREEMAN,<br>*Defendant-Appellant.* | No. 05-50401<br><br>D.C. No.<br>CR-03-00072-DT<br><br>ORDER<br>AMENDING<br>OPINION AND<br>DENYING<br>PETITION FOR<br>REHEARING AND<br>PETITION FOR<br>REHEARING<br>EN BANC AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
October 18, 2006—Pasadena, California

Filed June 11, 2007
Amended August 20, 2007

Before: John R. Gibson,* Raymond C. Fisher, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge John R. Gibson

---

*The Honorable John R. Gibson, Senior Circuit Judge, United States
Court of Appeals for the Eighth Circuit, sitting by designation.

10097

## COUNSEL

Myra D. Mossman (argued), Santa Barbara, California, for the defendant-appellant.

Debra Wong Yang, United States Attorney, Thomas P. O'Brien, Assistant United States Attorney, Chief, Criminal Division, Mark A. Young, Assistant United States Attorney, Narcotics Section, Elana Artson (argued), Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## ORDER

The opinion filed on June 11, 2007 is amended as follows:

On slip opinion page 7079, lines 5-6, replace <through the time of> with <until just before>.

On slip opinion page 7079, lines 13-15, replace <"ticket" signifies a drug price; "iggidy" refers to an ounce; "all gravy" and "straight" both signify> with <"wiggity" signifies high-quality cocaine; "gravy" and "straight" both signify>.

On slip opinion page 7088, line 29, delete <entire>.

On the final line of slip opinion page 7088, replace <Freeman, Mitchell, and Brown> with <Mitchell and Brown>.

With these amendments, the panel has voted to deny the petition for rehearing. Judges Fisher and Callahan have voted to deny the petition for rehearing en banc and Judge Gibson so recommends.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it. Fed. R. App. P. 35.

The petition for rehearing and petition for rehearing en banc, filed July 20, 2007, is DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

## OPINION

JOHN R. GIBSON, Senior Circuit Judge:

Kevin Freeman appeals from his conviction and sentence on one count of conspiracy to manufacture and distribute at least fifty grams of cocaine base and conspiracy to possess with intent to distribute at least five hundred grams of cocaine. Freeman argues that the district court erred in allowing the government's expert witness to testify regarding the meaning of encoded drug language and to testify as a lay witness. Although portions of the expert witness's testimony should have been excluded, we hold that the district court's error was harmless. Freeman's additional claims are without merit. We affirm.

### I.   Background

Kevin Freeman was the only defendant named in a three-count indictment. Count One charged him with conspiracy to

manufacture and distribute at least fifty grams of cocaine base as well as conspiracy to possess with intent to distribute at least five hundred grams of cocaine in violation of 21 U.S.C. § 846. The other counts accused Freeman of manufacturing and distributing cocaine base.

The indictment alleged that as a part of the drug conspiracy, Freeman purchased cocaine from Corey Mitchell and Maurice Brown. Mitchell and Brown were part of an earlier twenty-three defendant indictment, and since that time Mitchell had been cooperating with investigators. Freeman allegedly converted the cocaine into cocaine base and returned the cocaine to Brown for distribution in the Venice, California area. The Drug Enforcement Administration (DEA) had been investigating Mitchell and Brown as part of the Corey Mitchell drug trafficking organization since January of 2001, and during their investigation they intercepted telephone calls between Freeman and Brown. The indictment detailed a series of these calls between Freeman and Brown that occurred in May and June of 2001 that, allegedly using coded language, arranged for various drug transactions between Freeman, Brown, and Mitchell.

The evidence offered by the government at Freeman's jury trial consisted in large part of testimony from Bob Shin, a detective for the Los Angeles Police Department who was working with the DEA as a federal task force officer at the time of the investigation. Detective Shin testified as to the meaning of allegedly coded words used by Freeman in the intercepted telephone calls to facilitate drug transactions. Although none of the telephone calls contained explicit references to cocaine, Shin testified that they concerned that subject. While some of Shin's testimony focused on interpreting words or phrases he was previously aware of, such as "iggidy" or "all gravy," other portions of Shin's testimony focused on interpreting both words that he was not familiar with before the investigation and entire conversations. Defense counsel objected to Shin's interpretive testimony as hearsay,

speculation, and lacking foundation, an objection the court overruled.

The jury also heard testimony from Corey Mitchell. Mitchell testified that he had been a drug trafficker for approximately ten years and had been selling drugs to Freeman for approximately eight years. Mitchell testified that he originally sold Freeman cocaine base but that Freeman began purchasing powder cocaine sometime around 2000 because Freeman had learned to "cook" powder cocaine into crack cocaine. Mitchell described transactions involving Freeman cooking cocaine for the purpose of giving half back to Mitchell and Brown and keeping half to sell. Freeman also testified at trial. He admitted that while he and Brown were friends, the conversations recorded by investigators did not involve drug transactions, but rather the sale of stolen basketball tickets.

The jury deliberated for portions of two days before informing the district court that it was unable to reach a unanimous verdict. After learning that the jury had taken six ballots, the judge decided to give the jury the following instruction:

> Members of the Jury, you have advised that you have been unable to agree upon a verdict in this case. I've decided to suggest a few thoughts to you.
>
> As Jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your individual judgment and conscious [sic].
>
> Each of you must decide the case for yourself. But, only after you consider the evidence impartially with your fellow Jurors. During your deliberations, you should not hesitate to re-examine your own

views and change your opinion if you become per-
suaded that it is wrong.

However, you should not change an honest belief
as to the weight or effect of the evidence solely
because of the opinions of your fellow Jurors or for
the mere purpose of returning a verdict.

All of you are equally honest and conscientious
Jurors who have heard the same evidence. All of you
share an equal desire to arrive at a verdict. Each of
you should ask yourself whether you should question
the correctness of your present position.

I remind you that in your deliberations, you are to
consider the instructions I have given you as a
whole. You should not single out any part of any
instruction, including this one and ignore others.
They are equally important.

You may now retire and continue your delibera-
tions.

Two hours later, the jury returned verdicts of guilty on the
first count of the indictment and not guilty on the second and
third counts of the indictment.

The district court denied Freeman's motion for a new trial
and sentenced him to a term of 240 months imprisonment,
five years of supervised release, and a $100 special assess-
ment. Freeman now brings the present appeal.

## II.   Agent Shin's Testimony

Freeman argues that the district court abused its discretion
by allowing Shin to testify as to the meaning of coded drug
language used in telephone conversations between Freeman,
Mitchell, and Brown. Shin investigated the Corey Mitchell

drug trafficking organization from February of 2001 until just before Freeman's arrest. He was one of only four prosecution witnesses, and his testimony spanned three of the four days during which the prosecution presented its case. Shin offered interpretations regarding the meaning of thirty-six recorded telephone calls. Several of the words he interpreted were part of the jargon commonly used by drug traffickers and were familiar to Shin before the investigation. For instance, he testified that "wiggity" signifies high-quality cocaine; "gravy" and "straight" both signify that the situation is good; "dove" refers to the number twenty; and the terms "bread," "cheese," and "chips" all refer to money.

Shin also interpreted a number of words that he was not familiar with before the investigation but, as he explained, are easily decoded based on a manner of speaking common to drug traffickers. Shin testified that Freeman, Brown, and Mitchell altered words by placing "e-z" or some variant thereof in the middle of words. He interpreted "fezone" to mean phone; "teznower" to mean tower; "fezo" to signify four and "fezi" to signify five; "deezove" to mean dove; "pee-zark" to mean park; and "reezey" to mean ready.

Shin also offered interpretations for drug jargon that he was not familiar with before the investigation, but was able to decipher on the basis of the investigation and his general experience with drug trafficking. For example, Shin explained on the basis of his knowledge of the street value of cocaine that "cuatro-cinco," which are the Spanish words for four and five, signified $450. "Piece," according to Shin, signified ounce, and it was a term that he was able to decipher based on the context of a conversation between Mitchell and Brown. Shin interpreted "diamond" to signify the ten ounces of crack that would be produced by cooking nine ounces of powder cocaine. In this instance, Brown helped to reveal the term's meaning by stating that he was going to "pull ten," and then correcting himself by stating that he would pull a "diamond." Shin explained that he was familiar with the process of con-

verting powder cocaine into crack cocaine, and that with skill, an individual is able to increase the total weight of drugs.

Shin also offered explanations of statements by Freeman, Brown, and Mitchell that were not encoded drug jargon, but instead were phrases that were more likely to be understood by the jurors without assistance. When Brown instructed Mitchell to speak with him later so that they "can get all the particulars," Shin stated that "particulars" was a reference to the "details." Shin explained that when Mitchell asked Brown during one recorded call how everything had turned out, this signified that Mitchell was asking Brown how did the "drug deal turn out, how did everything go?"

There were other phrases that Shin interpreted that were not encoded drug language, but rather ambiguous statements consisting of ordinary terms. For one recorded conversation, Shin interpreted "long route" to mean a specific method for completing the drug transaction; "that" to signify money; and, later in the conversation, "that" to signify cocaine. In many instances, Shin was careful to explain his reasoning and the basis for his opinion. He offered his opinion as to the meaning of several conversations on the basis of context and his knowledge of the investigation as it was unfolding. At other points, however, Shin did not give an explanation of his reasoning. For example, during one recorded telephone call, Mitchell stated that he "touched bases with two of those." Shin testified, without offering an explanation, that this meant that Mitchell was able to obtain two kilograms of cocaine. During another recorded telephone call, Freeman informed Brown that he wished to get off of the telephone while driving. When questioned by the prosecutor about this, Shin testified that Freeman's desire to get off of the telephone was motivated by a fear of being pulled over and arrested for the possession of cocaine. Shin opined that during the telephone call, Freeman "wants to drive carefully so that he doesn't make any mistakes driving . . . or break any traffic laws where he's pulled over by law enforcement . . . and then searched,

which possibly could lead to the search and discovery" of cocaine. Again, Shin offered no explanation for why this was his interpretation, other than his belief that Freeman was carrying drugs.

## A.   Standard of Review

On appeal, Freeman argues that the district court committed error by allowing Shin to testify both as a lay witness as well as an expert witness and that the district court never properly admitted Shin as an expert witness.[1] Freeman further contends that the district court, by permitting Shin to testify as a fact witness, circumvented Fed. R. Evid. 702 and allowed Shin to testify in an unreliable manner. Freeman also argues that Shin was allowed to offer an opinion regarding ultimate factual issues, in violation of Fed. R. Evid. 704(b). The district court's decision to admit expert testimony is reviewed for abuse of discretion. *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000). We analyze Freeman's arguments under the harmless error standard used for reviewing non-constitutional evidentiary rulings: We are compelled to reverse the conviction "unless it is more probable than not that the error did not materially affect the verdict." *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997).

## B.   Reliability of Agent Shin's Testimony

---

[1]Regarding Shin testifying as an expert, we find no error by the district court. At the time of trial, Shin had been a police officer for eleven years, with more than four years of experience as a narcotics detective. Shin also testified that at the time of trial, he had participated in over one hundred narcotics investigations. Based upon his experience, Shin was qualified to offer expert testimony regarding the meaning of encoded drug jargon. Shin's expert testimony was also adequately disclosed under Fed. R. Crim. P. 16, and thus the testimony was properly admitted.

Freeman also argues that the district court improperly allowed Mitchell to testify regarding coded drug language. However, as a participant in the conspiracy, Mitchell could testify regarding his understanding of the coded terms he and his coconspirators used.

**[1]** The Supreme Court has established that Federal Rule of Evidence 702 charges trial judges with the task of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The gatekeeping role exercised by district courts "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This role applies to all expert testimony, not only to "scientific" expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

**[2]** Freeman contends that the district court erred in admitting Shin's testimony because the government failed to establish that Shin employed a reliable methodology in interpreting encoded drug jargon. Drug jargon "is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony." *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997). As the advisory committee notes to Rule 702 explain, such expert testimony is admissible provided that "the principles and methods [used by the expert] are reliable and applied reliably to the facts of the case." Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

In support of his argument, Freeman relies on our decision in *United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002). In *Hermanek*, the defendants appealed a district court's decision to allow the government's expert to interpret words and phrases solely on the basis of the expert's "general qualifications without requiring the government to explain the method [the expert] used to arrive at his interpretations." *Id.* at 1094. Although the government made an adequate showing of the witness's experience, the witness did not explain in detail the methods he used to arrive at his interpretations of words that he was not familiar with before the investigation. The court determined that there was "simply too great an analytical gap

between the data and the opinion proffered." *Id.* at 1095 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The court noted, however, that it was "not hold[ing] that a government expert . . . can never be qualified to interpret coded drug conversations using words and phrases experienced for the first time in the prosecution at issue," because such testimony would be admissible if the witness explained the methodology used to arrive at specific interpretations. *Id.* at 1096.

**[3]** Our review of the record leads us to conclude that Shin's interpretation of encoded drug jargon was admissible. Several terms, such as "iggidy," "ticket," and "all gravy" were familiar to Shin before the investigation. Other terms, such as "cuatro-cinco" and "diamond" were unfamiliar to Shin before the investigation, but Shin explained during his testimony how he arrived at his interpretations. Shin also offered interpretations of altered words such as "fezone" and "teznower," which we have acknowledged uses a methodology that satisfies *Hermanek*. *See United States v. Decoud*, 456 F.3d 996, 1014 & n.6 (9th Cir. 2006). The district court therefore did not err in allowing Shin to testify as to the meaning of encoded drug jargon.

**[4]** Shin's testimony, however, touched on matters far afield from the interpretation of encoded drug jargon when he offered interpretations of ambiguous conversations that did not consist of coded terms at all. For example, in one telephone conversation between Brown and Mitchell, Shin interpreted "long route" to refer to a drug transaction. In several conversations, Shin interpreted ambiguous phrases such as "that," "they," and "one of them," to refer to either money or cocaine. In another conversation, Shin interpreted Brown's statement, "Man, it's done already" to mean "he's given the cocaine to Kevin Freeman and that he's received his money for it." In these and other instances, Shin did nothing more than offer one possible framework for understanding the con-

versation. When offering this type of testimony, Shin usually explained his reasoning.

[5] However, in these instances Shin ceased to apply his specialized knowledge of drug jargon and the drug trade and began to interpret ambiguous statements based on his general knowledge of the investigation. He was therefore no longer testifying as an expert but rather as a lay witness. *See* Fed. R. Evid. 702 (stating that an expert opinion is based on "scientific, technical or other specialized knowledge"); *see also Daubert*, 509 U.S. at 589-91; *Kumho Tire*, 526 U.S. at 147-48. A lay witness may provide opinion testimony regarding the meaning of vague or ambiguous statements. *See United States v. Simas*, 937 F.2d 459, 464-65 (9th Cir. 1991); *United States v. De Peri*, 778 F.2d 963, 977-78 (3d Cir. 1985). But, unlike expert testimony, lay opinion must be "rationally based on the perception of the witness." Fed. R. Evid. 701. It must also be helpful to the jury in acquiring a "clear understanding of the witness's testimony or the determination of a fact in issue." *Id.* We have previously held these requirements were met when a law enforcement investigator testified regarding his understanding of the meaning of a declarant's vague or ambiguous statements. *See Simas*, 937 F.2d at 465 ("[Appellant's] statements to the FBI agents were vague and, at times, seemingly incomprehensible. The listener's understanding of the words and innuendo was helpful to the jury in determining what [the appellant] meant to convey."); *see also De Peri*, 778 F.2d at 977-78 (holding that it was permissible for a lay witness to testify to his understanding of defendant's ambiguous references and unfinished sentences).

Freeman argues that it was error for the district court to allow Shin to testify both as an expert witness concerning coded drug terms and as a lay witness. The dangers highlighted by Freeman were analyzed in *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003). In that case an agent with the DEA testified as an expert witness in the area of decoding drug jargon and as a lay witness giving general explanations

of conversations between the targets of the investigation. *See id.* at 49-51. The appellants argued that the government witness's "dual roles as case agent and expert witness allowed him to serve as a summary witness, improperly testifying as an expert about the general meaning of conversations and the facts of the case." *Id.* at 53.

**[6]** *Dukagjini* identified several difficulties that arise when a case agent goes beyond interpreting code words as an expert and testifies as to the defendant's conduct based upon the agent's knowledge of the case. First, "by qualifying as an 'expert,' the witness attains unmerited credibility when testifying about factual matters from first-hand knowledge." *Id.* Second, it is possible that "expert testimony by a fact witness or case agent can inhibit cross-examination . . . [because a] failed effort to impeach the witness as expert may effectively enhance his credibility as a fact witness." *Id.* at 53-54. Third, "when the prosecution uses a case agent as an expert, there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities, deviating from the strictures of Rules 403 and 702." *Id.* at 54 (quoting *United States v. Simmons*, 923 F.2d 934, 946-947 n.5 (2d Cir. 1991). Fourth, a case agent testifying as an expert may lead to juror confusion because "[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *Id.* Finally, "when a case agent/expert strays from the scope of his expertise, he may impermissibly rely upon and convey hearsay evidence." *Id.* at 55. In doing so, the witness may also run afoul of the Sixth Amendment Confrontation Clause. *See id.* at 58-59.[2]

---

[2]Freeman did not raise a Confrontation Clause claim below and he does not seek reversal on that basis here. Accordingly, we do not reach that issue.

**[7]** We share the concerns expressed by the Second Circuit in *Dukagjini*. First, we are concerned that a case agent who testifies as an expert receives "unmerited credibility" for lay testimony. *Id.* at 53. *See Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) (noting that because expert testimony is "likely to carry special weight with the jury . . . care must be taken to assure that a proffered witness truly qualifies as an expert"); *United States v. Foster*, 939 F.2d 445, 452 (7th Cir. 1991) (when expert witness also serves as an eyewitness, district court and the prosecutor should be vigilant in ensuring that "the jury understands its function in evaluating the evidence and is not confused by the witness's dual role"); *see also United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988) (when a government law enforcement agent testifies as an expert, there is a risk that the jury will give "undue weight" to the expert's testimony). In this case, the line between Shin's lay and expert testimony was never articulated for the jury. This lack of clarity regarding Shin's dual roles created a risk that there was an imprimatur of scientific or technical validity to the entirety of his testimony.

Second, we are also concerned that Shin was called upon by the government to give his opinion as to the meaning of numerous words and conversations, regardless of whether his testimony, at points, was speculative or unnecessarily repetitive. As *Dukagjini* explains, this form of expert testimony, "unless closely monitored by the district court, may unfairly provid[e] the government with an additional summation by having the expert interpret the evidence, and may come dangerously close to usurping the jury's function. . . . Such summarizing also implicates Rule 403 as a needless presentation of cumulative evidence and a waste of time." 326 F.3d at 54 (citations and internal quotation marks omitted). *See also United States v. de Soto*, 885 F.2d 354, 361 (7th Cir. 1989) (when an expert testifies as to the meaning of seemingly innocuous activities, district court ought be careful to ensure that "the expert . . . not base his opinion on mere specula-

tion"). District courts have the continuing responsibility of acting as the vigilant gatekeepers of expert testimony to ensure that it is reliable. *See Kumho*, 526 U.S. at 147-149. The fact that Shin possessed specialized knowledge of the particular language of drug traffickers did not give him carte blanche to testify as to the meaning of other words in recorded telephone calls without regard to reliability or relevance.

Third, as noted, the blurred distinction between Shin's expert and lay testimony may have allowed him to rely upon and convey inadmissible hearsay evidence. Once Shin stopped testifying as an expert and began providing lay testimony, he was no longer "allowed . . . to testify based on hearsay information, and to couch his observations as generalized 'opinions' rather than as firsthand knowledge." *Jinro America*, 266 F.3d at 1004; *Cree v. Flores*, 157 F.3d 762, 773 (9th Cir. 1998) (noting that expert testimony is "not subject to the strictures of Federal Rules of Evidence 602 and 803"). If Shin relied upon or conveyed hearsay evidence when testifying as a lay witness or if Shin based his lay testimony on matters not within his personal knowledge, he exceeded the bounds of properly admissible testimony.

**[8]** We agree, however, that the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited. *See Dukagjini*, 326 F.3d at 56. Testimony of this kind may save time and expense, and will not necessarily result in juror confusion, provided that the district court engages in vigilant gatekeeping. We think that it is sufficient to emphasize the necessity of making clear to the jury what the attendant circumstances are in allowing a government case agent to testify as an expert. If jurors are aware of the witness's dual roles, the risk of error in these types of trials is reduced.

**[9]** Turning to the case at hand, Freeman failed to ask the district court to instruct the jury regarding Shin's dual role and did not enter an objection raising that concern, such as an

objection based on Fed. R. Evid. 403. *See Dukagjini*, 326 F.3d at 54 (noting that when an expert witness provides lay testimony it implicates the concern under Rule 403 of juror confusion). We therefore review Shin's dual role testimony for plain error. Because the distinction between lay and expert testimony in this context is a fine one, we do not fault the district court for failing to intervene sua sponte. Thus there was no plain error. We also note that the opportunity does not lie solely with the district court to clarify in the eyes of the jury the demarcation between lay and expert testimony offered by the same witness. That distinction can also be revealed through direct or cross examination.

Freeman did enter running objections to all of Shin's testimony based on hearsay, speculation, and lack of foundation. Though Freeman did not specifically raise our concerns regarding Shin's testifying as a lay witness based on improper grounds, his objections did raise the essence of these concerns and we therefore do not review them for plain error but instead apply the ordinary abuse of discretion standard. *See Decoud*, 456 F.3d at 1010.

**[10]** The record reveals that the majority of Shin's lay testimony consisted of his interpretations of ambiguous conversations based upon his direct knowledge of the investigation. Although, unlike the witnesses in *Simas* and *De Peri*, Shin was not a participant in the conversations he interpreted, his understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations—in some instances coupled with direct observation of Mitchell and Brown—and other facts he learned during the investigation. *See Simas*, 937 F.2d at 464-65 (noting that the perception of the witness requirement is "simply a restatement of the personal knowledge requirement for all lay testimony"); *see also United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (holding that a lay witness's testimony is rationally based on the witness's perceptions if it is "based upon personal observation and recollection of concrete facts"). Such

testimony also proved helpful to the jury in determining what Freeman, Mitchell, and Brown were communicating during the recorded telephone calls.

**[11]** Although Shin's interpretation of ambiguous statements was permissible under Fed. R. Evid. 701, "the interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of both Fed. R. Evid. 701 and Fed. R. Evid. 702." *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988) (emphasis in original); *see also Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) (noting that Rule 702 "makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance"). It is necessary that a lay witness's "opinions are based upon . . . direct perception of the event, are not speculative, and are helpful to the determination" of factual issues before the jury. *De Peri*, 778 F.2d at 977. Some of Shin's testimony, however, consisted of either speculation or repetition of already clear statements. For example, Shin's unnecessary interpretation of "particulars" to signify "details" was not helpful to the jury, thereby violating Rule 701. As well, Shin's opinion as to the reason why Freeman wished to get off of the telephone while driving was speculation and therefore was erroneously admitted.

**[12]** Similarly, although Shin's lay testimony for the most part did not rely on or convey hearsay evidence, there were a few exceptions. For example, Shin interpreted Freeman's statement in one call to Brown that "I'm going to bring that to you at 1:00 tomorrow" to mean that Freeman would bring money to Brown that Freeman owed to Mitchell. Shin testified that his conclusion was based in part on interviews with Mitchell, who had told investigators that Freeman owed Brown money for cocaine that had been delivered before the call. Because Shin was testifying as a lay witness in this regard, his discussion of Mitchell's hearsay statements should not have been admitted.

C. Harmless Error

**[13]** Having concluded that limited portions of Shin's testimony were erroneously admitted, we must now determine whether the error was harmless. For errors that are not of constitutional magnitude, the government must show that the prejudice resulting from the error was more probably harmless than not. *United States v. Mett*, 178 F.3d 1058, 1066 (9th Cir. 1999). This requires a "fair assurance" that the jury was not substantially swayed by the error. *Id.* We conclude that the errors we have highlighted, when viewed in the context of the entirety of Shin's testimony and other evidence offered by the government, were harmless. As the district court concluded:

> These telephone calls, which were interpreted by an experienced narcotics agent, established that defendant's role in the conspiracy was to manufacture cocaine base from cocaine, and then distribute the cocaine base. In addition, these telephone calls and the government's interpretation of these calls, were corroborated by surveillance of Brown and Mitchell preparing to conduct a drug transaction with defendant, and with the testimony of Mitchell. During trial, Mitchell testified that defendant had converted one kilogram of cocaine into cocaine base as part of the drug conspiracy.

Most of Agent Shin's testimony focused on either interpreting encoded drug jargon or permissibly interpreting ambiguous statements. Shin's interpretations of the recorded conversations were often corroborated by the extensive surveillance he and other investigators conducted during the course of the investigation. For example, during one telephone call between Mitchell and Brown, Shin was able to interpret a series of words, including "chips," "cheese," "fezone," "teznower," and "Cuz." In that conversation, Shin interpreted Brown's reference to "Cuz" to mean Freeman, and his interpretation was

corroborated by the fact that Brown's next telephone call was to Freeman. Likewise, Shin's interpretation of "Teznower" to reference Tower Records was corroborated by surveillance of a meeting later that day between Brown and Mitchell at a Tower Records in Marina Del Ray. Surveillance by the investigators, combined with Shin's experience with encoded drug jargon and his knowledge of the circumstances surrounding the case, ensured a high degree of reliability for a majority of Agent Shin's testimony. The overwhelming portion of Shin's testimony was therefore properly admitted. This testimony connected Freeman to illegal drug transactions and contradicted his claim that the phone conversations concerned basketball tickets. In light of the evidence as a whole, we conclude that the erroneously admitted testimony was harmless.

### D.   Rule 704(b)

Freeman also argues that Shin offered opinions regarding ultimate factual issues in violation of Fed. R. Evid. 704(b), which provides that an expert witness may not state an opinion as to whether the defendant did or did not have the mental state or condition constituting an element of the crime or a defense thereto. An expert witness is not permitted to offer a direct opinion on the defendant's guilt or innocence. *See United States v. Fleishman*, 684 F.2d 1329, 1335-36 (9th Cir. 1982) (recognizing that there is a distinction between opinions of guilt or innocence and "expert testimony regarding the various roles played by persons involved in illegal enterprises"). According to Freeman, Shin violated Rule 704(b) by describing drug traffickers' general practice of encoding conversations so as to hide the fact that they are engaged in illegal activity. Freeman's argument is without merit.

Government experts may "testify as to the general practices of criminals to establish the defendants' modus operandi" which "helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seem-

ingly innocuous events may indicate criminal behavior." *United States v. Valencia Amezcua*, 278 F.3d 901, 908-09 (9th Cir. 2002) (quoting *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984)). We have allowed modus operandi testimony that "drug traffickers often employ counter-surveillance driving techniques, register cars in others' names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones." *Id.* at 909 n.4.

**[14]** Similarly, in this case Shin offered extensive opinion testimony regarding how he believed that Freeman's words and actions were consistent with the common practices of drug traffickers. For example, Shin's opinion on why Freeman wanted to get off the phone, while an interpretation of a seemingly innocuous statement, is not a violation of Rule 704(b). *See id.* at 908. Shin offered no opinion as to whether Freeman possessed the requisite criminal intent to possess and distribute cocaine, but instead described a common practice of those who do have such intent. We conclude that no error occurred. *See United States v. Lipscomb*, 14 F.3d 1236, 1239 (7th Cir. 1994) (citing cases in which courts have rejected attempts to exclude drug expert testimony under Rule 704(b) because the testimony "simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant" possessed such intent).

### III.   Freeman's Other Claims

#### A.   Broadening of Indictment

**[15]** Freeman also argues that the district court impermissibly broadened the indictment at trial. The Fifth Amendment guarantees a criminal defendant "[the] right to stand trial only on charges made by a grand jury in its indictment." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2002) (internal citation omitted). "An amendment of the indictment occurs when the charging terms of the indictment are altered, either

literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *Id.* (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). A constructive amendment occurs where there is "a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument," or when "the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Von Stoll*, 726 F.2d at 586 (internal citation and quotation marks omitted). Freeman argues that the evidence presented by the government detailing Mitchell's larger drug organization constituted an amendment of the indictment.

Freeman's argument lacks merit. The government elicited testimony from Shin about the investigation of Mitchell's drug trafficking because the testimony explained why there were so many intercepted telephone calls. The limited evidence offered by the government concerning the Mitchell drug conspiracy gave context for the charges and outlined the roles Mitchell, Brown, and Freeman had in the conspiracy. The indictment alleged that Freeman had purchased cocaine powder from Mitchell and Brown with the purpose of converting the cocaine powder into cocaine base, which would then be sold. Accordingly, the evidence offered by the government in connection with Freeman followed these alleged drug transactions and focused on the recorded telephone calls. The evidence presented therefore complied with the indictment, and Freeman's Fifth Amendment rights were not violated.

### B.   Sufficiency of the Evidence

Freeman contends there was insufficient evidence to support his conviction. We must affirm the conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To convict on a federal conspiracy charge, the government must prove " '1) an agreement to accomplish an illegal objective, 2) coupled with one or more acts in furtherance of the illegal purpose, and 3) the requisite intent necessary to commit the underlying substantive offense.' " *United States v. Chong*, 419 F.3d 1076, 1079 (9th Cir. 2005) (quoting *United States v. Pemberton*, 853 F.2d 730, 733 (9th Cir. 1988)).

There were two main witnesses who testified for the prosecution, Shin and Mitchell. They testified regarding Freeman's involvement in various drug transactions including arrangements made in numerous phone calls between Mitchell, Brown, and Freeman. Freeman testified on his own behalf. He contested Shin's and Mitchell's interpretations of those calls and provided alternative meanings. The district court, during the hearing on Freeman's motion for a new trial, summarized the opposing evidence:

> Well, the jury didn't buy [Freeman's testimony]. The jury, you know, believes it's a credibility issue as to what Mr. Freeman testified that the conversations meant, [and] what the officer testified.

**[16]** As the district court noted, this case came down to a question of credibility. Freeman offers no argument challenging the sufficiency of the evidence except to repeat his objection to the admissibility of testimony from Shin and Mitchell. When reviewing the sufficiency of the evidence, however, we "must assume that the evidence at trial was properly admitted." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1009 (9th Cir. 1995). Aided by this assumption (which we have examined and approved), we conclude that a rational trier of fact could have convicted Freeman of conspiring to manufacture and distribute cocaine base.

### C.   *Allen* Charge

Freeman argues that the district court's *Allen* instruction had an impermissibly coercive effect upon the jury. In assessing the coerciveness of an *Allen* charge, we consider "(1) the form of the instruction, (2) the time the jury deliberated after receiving the charge as compared to the total time of deliberation, and (3) any other indicia of coerciveness." *United States v. Daas*, 198 F.3d 1167, 1179-80 (9th Cir. 1999).

**[17]** Nothing in the instant case indicates coerciveness on the part of the district court. The instruction given here has been described as a "neutral form of the *Allen* charge." *United States v. Steele*, 298 F.3d 906, 911 (9th Cir. 2002) (discussing 9th Cir. Model Crim. Jury Instr. 7.7). The jury deliberated for approximately three hours before announcing their deadlock and for two hours following the *Allen* charge. This timing does not give an indication of coercion. *See Daas*, 198 F.3d at 1180 (approximately four hours of deliberations before the *Allen* charge and one hour after did not indicate coerciveness). No other indicia of coercion exist. We therefore conclude that the district court committed no error in delivering an *Allen* charge.

### D.   Sentence

Freeman contests the reasonableness of his sentence. We review the reasonableness of the ultimate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. 220, 260-62 (2005); *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006). The district court's interpretation of the Sentencing Guidelines is reviewed de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error. *Id.*

**[18]** On this point, Freeman again refers to the testimony offered by Shin and Mitchell, arguing that there was insuffi-

cient evidence that he was involved in the conversion of two kilograms of cocaine. However, in a special verdict form the jury found that Freeman's crime involved between five hundred grams and five kilograms of cocaine. The district found that Freeman had converted at least two kilograms of cocaine, and that finding is well supported by the record. The district court did not abuse its discretion in calculating the guidelines range. The district court sentenced Freeman to a term of imprisonment fifty-two months below the bottom of the advisory range. No basis exists for determining that the district court's sentence was unreasonable.

## IV.   Conclusion

We conclude that the issues discussed in this opinion do not warrant reversal. Freeman's conviction and sentence are AFFIRMED.